The next matter on our calendar is Fernando Galina v. William Barr. Council? Good morning, Your Honor. It's Joshua Draytel for Mr. Galina. And in this case, the Bureau of Immigration Appeals reversed the IJ's findings without a sufficient explanation, contrary to everything in the record, ignoring important undisputed evidence, and without challenging any of the IJ's factual findings or credibility determinations. This case is very much like the case the court recently decided, and I know the court's familiar with it because Judge Poole wrote the opinion in Manning v. Barr, in which the BIA discounted the petitioner's credible testimony without proper explanation, ignored substantial and material evidence, didn't identify any inconsistencies in testimony, did not identify any adverse credibility finding, and ignored an expert affidavit, which also is true here. And so here, the BIA's opinion is just contrary not only to the factual record, but also to in terms of the legal principles that the BIA stated are contrary and in conflict with positions that this court has taken over and over again. The BIA had strained efforts to limit the definitions of torture and create certain straw men with respect to elements of the Convention Against Torture of the Cat claim, and this is a case where Mr. Galina was tortured. He meets all the CAT criteria, and even the BIA said he's going to go back to the same circumstances if returned to Italy, and that will be torture again. So the BIA's two-to-one decision that was a dissent erred in reversing the IJ's meticulously crafted decision that was based on an uncontroverted record and a proper analysis of the legal standards. And in terms of review, there's a de novo standard for questions of law and application of facts, but also the substantial evidence standard for factual decisions, which the court also explained in Manning recently, it requires that it be supported by reasonable, substantial, and probative evidence in the record when considered as a whole, and that goes back to Cohn v. Holder and Castro v. Holder. In all the cases from this court for decades, and it's even de novo if the BIA's application of law is to an undisputed fact, and here there were no disputes with respect to the facts in the BIA opinion. And so, as the court said in Manning, there's a certain minimal level of analysis from the BIA as well as some indication that it understood material evidence supporting the petitioner's claim, and here we didn't have that again. That also goes back to Castro v. Holder and Chen v. Gonzalez, which is if the BIA fails to consider relevant and important evidence, the court is deprived of the opportunity to adjudicate, and that's what happened here. Yes. This is Judge Walker. Oh, you want me to go ahead? Okay. Yes. Isn't torture, isn't this really a question of taking section 1208.18, the implementation of the Convention Against Torture, and looking through that and studying those definitions and comparing that to the facts of the case? That's really essentially what this case is about, isn't it? It is applying the Convention Against Torture to the facts of the case, but it's applying the definition that are set forth in this section 1208.18, right? Right, but what the BIA did was create its own definitions. For example, the BIA said he wasn't given... BIA applied a new standard. In other words, they said, he wasn't given psychotropic mind-altering substances, but it doesn't matter what he wasn't subjected to. It matters what he was subjected to, and the IJ went through the record very carefully. He was subjected to solitary confinement, which is well known to us in the federal prisons as a general matter. But there is law, not only in the Supreme Court, as to whether it's an Eighth Amendment violation, but also in the context of torture, the international standards are that solitary confinement for more than 30 days, for non-punitive reasons, is torture. And the difference here, and if you look at the Gambino Ninth Circuit, it found all of the elements of torture, except for one, for the same facility that Mr. Galina was in, and it found severe pain and mental suffering. But the only thing was it arose from lawful sanctions. There was no evidence... I'm sorry. Sorry, Your Honor. You know, you can keep talking if you want. I have questions. I would think that would interest you. Isn't the very definition of torture the intentional infliction of severe physical, mental pain, and suffering, as opposed to lawful incarceration or lawful detention? Yes, Your Honor. But here, it is not incidental lawful incarceration, because it was clear, uncontroverted evidence. But Your Honor, can I answer your question, which is that here it was designed, the conditions to which Mr. Galina was subjected were designed to elicit confessions from him, to get him to cooperate with the government against himself and against the Confederates. That is unlawful. That is a violation of the Convention Against Torture. If solitary confinement at the MCC, or the MDC, or Florence, Colorado, were imposed specifically for the purpose of making a defendant confess, that would be unlawful here as well. Mr. Cretel, are you asking us, Judge Lynch, are you asking us to declare that the Italian members of organized crime from getting information and directives out to their colleagues out of the prison, but instead, simply as a device to break people and get them to cooperate? Is that what we have to decide in order to reverse the BIA here? No, because the BIA didn't even reach that issue as to unlawful. I think you would remand it for them to actually reach the issue, but I think you wouldn't have to find it as a matter of forever. But here, this defendant was told that this was exactly what he was told over and over again. You're going to be denied medical care, you can't see a psychologist, and you can't see a doctor until you start cooperating. So those are things that are making it very different than Gambino, and do get it within the convention. Now, let me just say that in terms of what the program's design was, the BIA expressly found it was designed to disrupt criminal organizations. And then the way it was carried out was that they let them out for one hour to meet with three other prisoners in groups of four, but then broke that group up after a short period of time so that they wouldn't see more of the same people and develop friendships and trust and so forth, which was inimicable to the stated purpose of trying to prevent collaboration and crimes being engineered from the prison. But there is a specific finding by the BIA and a statement that it's designed to disrupt criminal organizations. And why, at the very least, isn't there substantial evidence to prove that? No, because it ignores all of the contrary evidence. And it's all in the 18-page, very meticulously annotated. But if you have two competing evidence that's competing, and the standard is substantial evidence, why can't there be substantial evidence and still be consistent with substantial evidence the other way? But it's the BIA's determination here. It's not competing evidence. It's evidence that works at the same time. While it is one of the purposes of the facility and the conditions at the facility to house organized crime figures, it is another coordinate purpose of the facility explicitly expressed to the people there, and also known in the European community. It's in our brief, all the European human rights organizations, the Council of Europe, that have tried to get information and visit the facility. But it's also one of the purposes is to break them. And I think the substantial evidence, BIA can't ignore the other evidence. Where's the specific finding by an international organization that the purpose was to break, and not to do the other? It's in our brief, and I think the Council of Europe at some point says that they want more information about that from the Italian authorities. Exactly. But also there was expert testimony that that is one of the purposes. So the BIA ignores all of this, and even says on page three of its opinion, it says, we need not determine whether the immigration judge, and I'm quoting from the opinion, judge improperly found that respondents incarceration under the 41BIS program was not a lawful sanction, because the intent of the program is to break prisoners psychologically, and coerce them into cooperating with law enforcement officials, as opposed to its ostensible purpose to isolate dangerous members of criminal organizations in order to prevent them from orchestrating criminal activity while in prison. And that is just... That's not the BIA opinion. Yes, it is. Yes, it is. It's on page three. It's the first full paragraph. They don't decide the issue. Oh, okay. I'm sorry. I thought you were stating it as possibly. This is Judge Pruitt. Doesn't the petitioner himself claim that he was told that the purpose of the imprisonment was to get him to give information about other members of the mafia? Repeatedly. Not only was he told that just initially, but also when he made requests to doctors and see psychologists because of the effect that these conditions were having on him, he was told, well, you're non-compliant because you haven't collaborated with the government yet, and so therefore we won't have a doctor see you. We won't have a psychologist see you. So yes, it's his testimony, uncontroverted. It's the expert's testimony, and yet the BIA obviously passed on that issue, but created all sorts of other limitations on the convention. They said that... They claimed that even after he refused to cooperate, he wasn't punished, but yet he was. He wasn't allowed to see a doctor. This is Judge Pruitt again. Did either the IJ or the BIA find that the petitioner was not credible? No. The IJ found the petitioner credible. In fact, the petitioner was credible to the extent that even when asked about his mafia activities, he was candid about them and admitted his role in the Sicilian mafia while he was still there, and the BIA did not challenge or controvert a single credibility finding by the IJ. You have a three-page BIA opinion versus an 18-page meticulously annotated IJ opinion. Thank you. Are we reviewing this de novo, or are we just reviewing the IJ's opinion, or are we reviewing the BIA opinion for substantial evidence? You're reviewing the BIA opinion for substantial evidence because the way it works currently in the immigration context is that once the BIA reverses an opinion by the IJ, that's what you're looking at, but I think the IJ opinion informs the inadequacy and the deficiencies legally and factually in the BIA opinion. Your review is de novo for questions of law. Your review is de novo for application of law to facts, particularly to undisputed facts, and the substantial evidence part only goes to the factual findings, which really, they don't do anything but adopt the facts of the IJ. What is your evidence of an intent to torture on the part of putting him in the program? Did they put him in the program with an intent to inflict physical pain and suffering? Yes, because that's the nature of the program itself, and also, when you talk about intention, this court has found in a number of- That gets down to the question of what the purpose of the program was, a finding of the BIA as to the purpose of the program. Well, again, it's not a finding they passed on that issue, but the other part is that intention is not specific. The BIA says it was designed to disrupt criminal organizations, and there was evidence about the design, the government's stated purpose of what the program was about, which was this business of keeping the people isolated from one another so that they couldn't commit further crimes while in jail. But also, Your Honor, in regards to your question about intentionality, this court has found in many cases, Pierre V. Gonzalez, Celadon, De La Rosa, that intention is to do the act. In other words, if the act is done, you don't have to specifically want to give him an ulcer. You don't have to want to give him hemorrhoids. You don't have to want to necessarily force him to want to commit suicide, but if you do the act, that is intentional. And also, the question of intentionality is not related to the design of the program because you can have people acting outside the design of the program, and this is part of the case law of this court. But Mr. Drattel, excuse me, Mr. Drattel, this is Judge Lynch. The definition of torture specifically requires a specific intent and draws on the criminal definition. So it seems to me that one question is, is this program designed not necessarily, of course, not to create any particular symptom, but is it designed for the purpose or with conscious awareness that it is going to create severe mental suffering? Is that not a requirement of torture? Yes, and the answer is yes and yes because these conditions are imposed for the purpose of breaking prisoners. Even if, excuse me, even if they are imposed with one purpose, for example, I've heard it said by Justice Department officials that one of the things that's good about mandatory minimum sentences is that it encourages cooperation. That's one of the reasons why people are incarcerated for extreme lengths of time or can be under the statutes. But the question is not, is it something that is a harsh condition that is likely to and maybe even is intended to encourage people to change their ways, as it were. The question is, are these conditions either specifically designed to cause serious mental suffering or even is there, you know, let's go with willful blindness or even recklessness, a conscious understanding that it is going to cause severe mental suffering? Is that a requisite for it to be torture? Regardless of what the purpose is, the ultimate motive is of making a harsh regime. Is there not that kind of specific intent requirement? Even if there is, it's met here because, yes, the denial of medical care, the denial of psychological care, the arbitrary imposition of solitary confinement, the interference with visits that making it very difficult for the defendant to communicate with his family, making it almost impossible for him to do so. Those are all elements that are specifically designed to cause the kind of mental suffering that will make someone say, OK, I give up. I will now cooperate. Well, the kind of suffering that makes someone give up is not necessarily the same thing as severe mental suffering. There are a lot of things that might lead me to cooperate with authorities because I want to go to prison at all, because for many people, the impetus is they don't want to give up their money. If you offer them no forfeiture, they all cooperate. That doesn't mean that those things constitute severe mental suffering or that it's so intended. Language that I have is other procedures calculated to disrupt profoundly the sense of the personality. What about that as a definition for torture? Yes, Your Honor, and these all meet that definition. I think what the BIA did was parse out some very, very specific parts of the definition and then say that's not here, when in fact the IJ looked at the broader definitions and said, here's where it does meet that standard. I think that's what the court should be looking at, not necessarily about the IJ's opinion, because that's not before the court, but the rationale that the IJ used and her consideration of the full range of the criteria for torture puts this squarely within it. Judge, let's just answer your question, which is that if someone at the MCC were suffering from medical problems, and the doctor said, I can't see you until you plead guilty or cooperate with the government, everyone would have a problem with that. That's what we have here. Would it be torture under the definition is the question? Yes. This is George Walker. The problem I have with the other procedures calculated is that that plainly is not addressed to the end of this program. It's within a subsection that deals with mind-altering substances or other procedures calculated to disrupt the census, and that might be waterboarding or it might be breaking a person down by not letting them sleep for 10 days. A term like that is informed by the company it keeps, which is mind-altering substances. I don't think that's directed. I would never read this as directed at the entire program. Well, if you have solitary confinement combined with a lack of air and a lack of light and systematic denial of communication with family members and denial of medical care, I think you get there rather easily. Even if it's not easily, it still gets there. To look at the full range of a six-and-a-half-year period for someone to be exposed to this is a violation. It meets the definition of torture. In Gambino, the Ninth Circuit found that this very facility constituted all of that. The only thing that the Ninth Circuit didn't find, they said, the only reason you lose to Gambino is because it's incident to a lawful sanction. No one made the argument that there was any improper purpose. Here we have not only argument, we have uncontroverted evidence of an improper purpose. So if you look at the Gambino decision... What is the improper purpose apart from the plaintiff's own testimony? But what about the Italian government's purpose in establishing this 41-BIS? Doesn't that count for something? Not when they're implementing it in a way that clearly has an alternative purpose, that is expressed explicitly over and over again to the defendant, that the expert is aware from his own research and work, and which the Council of Europe has expressed concern about. I'll find that in our brief. But it's in our brief, the Council of Europe's concern about this. So you have from three different sources, you have an uncontroverted, you have the BIA ignoring essentially important and relevant evidence, and this court has repeatedly, in Manning, in other cases, has said, you can't do that, and remands. And I think that's what the court has to do here. Counsel, your time has long expired. You deserve two minutes for rebuttal. We'll hear from the government. May it please the court, Jennifer Corey, on behalf of the Attorney General. I first want to just clarify that I don't think that there's any dispute here under the law of this court that this is going to be reviewed for substantial evidence, and it's the board's decision that's being reviewed. Predictive findings, the fact of whether somebody is going to be tortured, or there's a likelihood of torture, it is well settled that that is a review. But doesn't that beg the question, this is Judge Lynch, sorry, of what is torture? It's a factual question, but there's no factual dispute, is there, that Mr. Galeno was subject to certain conditions before and will be subject to them again. The question is whether those of torture, isn't it? Yes. So that's de novo review, is it not? It's whether, well, since the board factually found, right, it's a factual ruling that he will not, doesn't face a likelihood of torture. Am I not understanding your question correctly? It's a factual question whether he will be subjected to torture in the future. But here, I think there's no real dispute, is there, about what he will be subjected to. The question is whether that amounts to torture. Right. So is that not a legal question that we would review de novo, or at best for your position, an application of law to not particular, well, there may be some factual disputes there, and we can talk about what they are. But the ultimate question is whether these conditions meet the legal definition of torture, isn't it? Yeah, I believe that's correct. I can, yes. Okay. So that's 1208.8. And the question, the only argument that I've seen that's being made now about mental suffering is this business of other procedures that are designed to alter the mind or the senses, I don't know the exact word, or disrupt the personality. That's the argument that's being made. And I'm not quite sure what the other procedures are. Maybe that'll be clarified a little bit more on rebuttal. But my assumption is the entire program does that. Or the way he was, the way some of his requests were taken. He wanted to see a psychiatrist about his insomnia at one point, and whether that was denied with the intent of whether that denial was another procedure designed to disrupt his senses and the like. The rest of the definition, it seems to me, it's very hard to see how this case fits the mental suffering paradigms in that particular subsection four. It doesn't. And there were no procedures designed to impede his personality. I'm sorry, I'm summarizing. The exact language is made, just to help you out, the exact language is, in order to constitute torture, mental pain or suffering must be prolonged mental harm caused or resulting from a list of things, one of which is the administration or application of either mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality. That's the language that I think Judge Walker is asking you about. Thank you, your honor. Thank you. I mean, I think that the bottom line here is that there is this part of the, the point of the 41 beast is to keep these criminals isolated because in order to stop them from perpetuating their criminal activity outside of the prison. Now, whether or not there is coercion at points, there's no evidence to say that they're, that basically the evidence says that there might be instances where that happens, but as a whole, and this was found in Gambino too, I think opposing counsel mischaracterized with Gambino. Gambino found that there were instances where there was severe beatings or severe sexual violence that was used to coerce that would have, what they would have said was torture, but they found that as a whole, the prison system was used for a legitimate purpose. And so that is not a purpose. The purpose was not to affect the personality. I think you would agree that a prolonged mental harm is required. Um, uh, so if it's a program of waterboarding over time, uh, every day for, uh, you know, two weeks at a time, that's, that's, that's much more easily fits into this torture and the other procedures, uh, then, um, maybe an isolated refusal of a request to see a psychiatrist about insomnia. Correct. I mean, I think, I'm sorry, you're on. This was an isolated, wasn't this was a continuing program. He never was allowed to see someone about his insomnia. Never. Isn't that true? Uh, I believe that was his testimony. And I will say that I, I think that speaks to the point too, that, that it's in the record that it was hard to see psychiatrists in or psychologists in the, in that prison system, which does not constitute torture. And then I'll also say that, um, he was treated the same way throughout. So he keeps claiming that he refused to comply with turning over other mafia members. But since the beginning of his day in the 41 beast to the end, he was never retaliated upon. And so there was no specific intent to have him turn on his mafia. He's other mafia members. He was just treated as a standard prisoner in the 41 beast. And I think it's also important. Excuse me, Ms. Curry, is there evidence that the standard prisoner is told that you can't see a psychiatrist, uh, until you cooperate? Is that, is that something that is, um, a feature of the program? No, your honor, but that wouldn't, that's something that he was, that doesn't constitute torture in itself. Right. Right. But I also, he, he, he testified that he was also non-compliant with the standard rules of the prison. He said that he got in trouble for talking to a prison mate that he was not allowed to talk to. And then he said that he was told he couldn't see a psychiatrist because he was non-compliant. And I am unsure as to whether that means non-compliant with the actual standard rules or not compliant with turning on, turning over other mafia members. Um, and that's it. Those are, that's a prison system. And I will say the, the prisoner in Gambino or the petitioner in Gambino was imprisoned in a New York facility and, and put in solitary confinement for six months. And the psychiatrist in that, in that case said that he suffered in part because of the six months solitary confinement, PTSD and other medical medical conditions. And that is, that is what happens in harsh prison systems. And there's a reason that Italy with their history of pervasive mafia activity have, um, have implemented this prison system. And the fact that I have a question. Um, I didn't see it anywhere in the briefing. Do you know whether there have been, uh, cases brought and decided, uh, in the federal courts about the, whether or not the, uh, incarceration in Florence and these very strict detention centers such as Florence, Colorado, uh, are cruel and unusual punishment. Your Honor, I do not know, but I go ahead. I'm sorry. I think, I think, um, my guess is because those programs continue, uh, that if such a case is such, if such a claim was made, it was turned down, uh, by the courts. But, um, I haven't, uh, my research hasn't gone that far. And so I don't, I don't know, obviously if it's not cruel and unusual punishment, uh, it's not torture just the program itself. Um, but, but, uh, I just wondered if, if that was something that, uh, that you knew anything about, I'm sorry, I do not know. Um, but I, if you would like to know more about it, I'm happy to do supplemental briefing on it. Of course. Um, actually I think it would be helpful. Okay. I would ask the presider if we could have a letter on that. Of course. Would you state what you would like the topic of the letter to be? Yes. Yes. What, whether, whether detention at a high security, maximum security or super max security, uh, uh, prison or detention center is, is, is cruel and unusual punishment. And has that ever been litigated? Is that what you're interested in? Whether, whether it's ever been litigated and whether it's ever been declared to be cruel and unusual punishment or not. Um, that's, that's fine. So council, you understand the request and Mr. Gradle, you also can respond. Both of you will respond within 10 days, 10 pages, single space. Okay. And will that be in order? I'm sorry. I didn't hear your question. Go ahead, Mr. Oh, I just said you said 10 pages, your honor, single space. Yes. 10 pages, single space. Um, and you'll have to respond at the same time. So it won't be responsive, but this is a matter of research that judge Walker is requesting. And I assume you can each do it separately and help inform the court. Okay. Thank you, your honor. Thank you. Thank you. And this core, your time has expired. You have two minutes for a bottle. Thank you, your honor. And, um, with respect to the standard, um, that is DeNovo for application of facts to law and substantial evidence is only with respect to factual the, as set forth in our brief, uh, in detail, the BIA applied the wrong standards with respect to torture and, and with respect to torture in terms of mental pain and suffering, we're not just saying that that section, it goes to anything that, that, that is designed to, uh, uh, inflict that and, and judge Pooler raised that issue. Um, and, and we certainly adopted, but it's not just limited to that. Second is in terms of prolonged, this is six and a half years of this type of, uh, um, uh, condition that Mr. Galina was subjected to. And it's a range of things that he was subjected to. His non-compliance was clearly expressed to him as not cooperating. And also, um, and then, and he, and that's, uh, uncontroverted factual finding also with respect to the ADX, the Florence issues, there have been some lawsuits, uh, with respect to certain constitutional rights and the courts have, have, uh, changed some of the, uh, the conditions there, uh, as a result of that. But also the what's missing from those lawsuits to the extent that there are any eighth amendment lawsuits, what's missing and is present here is that no one is saying that people are in Florence until they cooperate. No one is saying that people are in Florence until they do something that, that, that the, that the state is not permitted to extract from them under the convention against torture. That is the distinction here. But isn't it quite typical in, in our system anyway, uh, for law enforcement to always look for cooperation and always look for people who are in jail to, to say, talk about crimes that they're aware of that occurred on the outside and to, uh, take that sense, any cooperation, uh, to the judge, to the district court, to have the sentence revisited. Um, or, or, I mean, that's just sort of normal law enforcement procedure, but that's really apples and oranges, your honor for this. I've been, I've been a defense lawyer for 40 years, and I do not have a single experience in this country of a client being told you can't see the doctor until you cooperate. You can't get out of solitary confinement until you cooperate. You can't, you can't have light or air in your cell until you cooperate. Never. And I have represented some extraordinarily serious cases. I have more clients in Florence than probably anyone else. And this is the distinction that makes this different. Thank you, your honors. Thank you. Thank you. We'll reserve decision. The letter brief requested by judge Walker will be due May 8th, 10 days. Um, no more than 10 pages, single space, and we will, um, uh, reserve decision, uh, certainly until we received your letter briefs.